IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| JAMES W. ROBERTSON SR.<br><br>Plaintiff<br><br>-v-<br><br>INTRATEK COMPUTER, INC., ALLAN FAHAMI, ROGER RININGER<br><br>Defendants. | **A18CV0373 LY**<br>Civil No. _____ |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

NOW COMES Plaintiff James W. Robertson Sr. and files Plaintiff's Original Complaint.

While working at Intratek Computer, Inc, James W. Robertson Sr. saw a lot of illegal behavior. Robertson saw the president and CEO of the company, Allan Fahami, bribe VA officials with lavish dinners, happy hours, and at least one trip to Las Vegas. He saw Fahami unlawfully obtain and use non-public information to gain an advantage for Intratek and Intratek's business partners in competing for contracts with the Department of Veterans Affairs. Fahami asked Robertson himself to unlawfully get insider information about future contracts before the terms were made public. Fahami asked Robertson to violate non-disclosure and trade secret agreements with Intratek competitors to get a competitive advantage. When

Robertson refused to violate the law and called Fahami out for his unlawful behavior, he was fired.

On October 7, 2015, Robertson reported what he witnessed and how he was fired to the Office of the Inspector General for Veterans Affairs. An investigation was opened. The FBI was brought in and the investigation is still open, active, and ongoing.

After firing Robertson and after his report to the OIG, Fahami, Intratek and Roger Rininger, a VA Official, went after Robertson's livelihood and reputation. They told current and potential business partners Robertson was unstable, incompetent, and not to be trusted. They caused contracts to be cancelled and business relationships to sour. They are attempting to silence him.

Their actions violate the law.

# I
# PARTIES

1. Plaintiff James "Jim" W. Robertson Sr. is an individual who resides in Williamson County, Texas.

2. Defendant, Intratek Computer, Inc., is a California corporation doing business in Texas. It may be served through its registered agent 1999 Bryan St., Ste. 900, Dallas, TX 75201.

3. Defendant Allan Fahami is an individual who may be served at Intratek Computer's headquarters located at 9950 Irvine Center Drive, Irvine CA 92618

4. Defendant Roger Hayes Rininger is an individual who may be served at 1628 E. Ryanswood Cir., Allegan Michigan, 49010.

## II
## JURISDICTION AND VENUE

5. This Court has original jurisdiction to hear this complaint under 28 U.S.C. § 1331, this action being brought under 41 U.S.C. § 4712(c)(2).

6. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367, these claims being so related to the claims in the action within this Court's original jurisdiction that they form part of the same case or controversy.

7. Venue is appropriate because the acts giving rise to this lawsuit occurred within the Western District of Texas.

## III
## FACTS

**A. Intratek Computer hired James W. Robertson Sr. because of his knowledge and experience with federal contracts to provide services to the Department of Veterans Affairs.**

8. Intratek Computer provides IT services and staffing to state, federal, and county government agencies in many states including Texas.

9. Specifically, Intratek Computer has repeatedly contracted and subcontracted with the Department of Veterans' Affairs to provide various IT services.

10. Mr. Robertson first started working for Intratek Computer on July 11, 2011 as a SharePoint administrator/developer and InfoPath Developer/SME. At that time Allan Fahami was the CEO of Intratek.

11. Prior to joining Intratek Computer, Mr. Robertson had extensive experience with the VA contracting process from prior jobs including as a SharePoint administrator/developer at Kforce Government Solutions, another company that competes with Intratek for contracts with the VA.

## B. Contracting with the VA requires companies to go through a bidding process.

12. Contracting with the federal government usually requires companies to go through a bidding process.

13. IT contracts with the VA go through the Enterprise Service Desk, which used to be called the National Service Desk.

14. That bidding process generally starts with the federal government issuing a Performance Work Statement (PWS) that details the work or services sought, the requirements for providing those services, and how successful performance of the contract will be measured.

15. Companies then submit bids to the government offering to provide the services and meet the requirements listed in the PWS.

16. From the companies that submitted proposals, the federal government then selects which one best meets its needs and awards that company the contract.

17. It can and often does get a bit more complicated, involving prime contractors, subcontractors, non-disclosure agreements, teaming agreements, workshare arrangements, and set-aside contracts.

18. For example, because the services the federal government seeks cannot usually be provided by a single company, companies often enter into non-disclosure agreements with other companies that later result in teaming agreements to work together if they win the federal contract. In fact, teaming agreements and workshare arrangements are strongly encouraged by the federal government and the VA, in particular.

19. The main contractor who receives the contract award is called the prime contractor. The companies that work with the prime contractors are known as subs.

20. Regarding IT contracts with the VA, once a contract is awarded, there are rules and regulations about which company, the prime or the subcontractor may contact the Technology Acquisition Center (TAC). Specifically, only the prime contractor may contact the TAC.

## C. Companies that gain early access to Performance Work Statements, contract pricing, and contract expansion plans have a huge advantage in bidding for government contracts

21. The name of the game in federal contracting is information.

22. Companies that gain access to early, inside information about VA contracts have an advantage in bidding for the contracts.

23. For example, if a prime obtains a draft PWS before it is made public the prime will gain extra insight into the requirements for a contract. This is especially true if, as often is the case, not all of the requirements in the draft PWS, are listed in the final PWS. Moreover, having a draft PWS would also provide a Prime contractor with additional time to prepare for a bid.

24. If a sub obtains a draft PWS, then the sub can use that information to get a better workshare arrangement or teaming agreement with the prime.

25. Nonpublic information about government pricing and contract expansion can also be extremely valuable to companies seeking to win contracts with the VA.

26. The VA houses its contract information on a SharePoint site run by the National Acquisition Center. SharePoint administrators like Mr. Robertson have access to this information. But it is illegal to access

### D. Allan Fahami and Intratek repeatedly asked James W. Robertson Sr. to obtain and provide unlawful insider information about VA contracts.

27. When Mr. Robertson was hired, he revealed that he had non-disclosure agreements with several firms that compete for contracts with the federal government and the Department of Veterans Affairs. These agreements prohibited him from disclosing confidential information to competitors such as Intratek. At that time, Mr. Robertson also indicated that he was not willing to breach those agreements to provide inside information to Intratek.

28. In Spring 2012, that is exactly what Mr. Fahami asked Mr. Robertson to give Intratek and its partners to insure they had a clear and decisive edge in competing for government contracts.

29. When Mr. Robertson protested, Mr. Fahami stated that everything would be ok as long no government resources were used, and things were not done through texts or emails. In other words, Mr. Robertson was not supposed to create a paper trail.

30. These requests for Mr. Robertson to violate his non-disclosure agreements and provide Intratek inside information occurred approximately every three months.

31. Not only was Mr. Robertson asked to violate non-disclosure agreements with competitors, but Mr. Fahami also repeatedly asked Mr. Robertson to get insider non-public information regarding contract pricing and project size through his SharePoint administrator status. Mr. Robertson refused to do this every time.

32. In September 2015, Mr. Robertson refused to breach his agreement and told you that he believed what he was being asked to do was illegal.

### E. Allan Fahami obtained unlawful non-public information on future VA contracts.

33. On at least one occasion, Mr. Fahami obtained draft PWS for VA contracts.

34. Mr. Fahami also obtained pricing information for that contract.

35. Mr. Fahami used this information to secure a better deal with Lockheed Martin, who was going to be prime on the particular contract.

36. In fact, Mr. Fahami informed Mr. Robertson that Lockheed Martin opened an entire office in Los Angeles, CA with the main purpose of providing Mr. Fahami a place to pass on this non-public information to other sub-contractors of Lockheed Martin.

37. Obtaining this information and using this information is unlawful.

**F. Allan Fahami and Intratek bribed VA officials at the Enterprise Service Desk by paying for lavish dinners at steakhouses, providing them with a credit card to use for happy hours, and paying for at least one trip to Vegas**

38. The non-public information Mr. Fahami obtained for Intratek came through unlawful efforts to curry favor with VA officials who worked for the Enterprise Service Desk (ESD), which used to be called the National Service Desk (NSD).

39. Allan Fahami and Intratek worked hard to curry favor with VA employees who worked at the ESD or the NSD.

40. This included bribes.

41. For example, Mr. Fahami would routinely host big and expensive dinners at both Fleming's Steakhouse in Austin that would be attended by VA officials including Andrea Kucharski, the Information Technology Manager for the NSD, Wendy Owens, Chief of Operations at the NSD, and Roger Rininger, Service Line Manager at the NSD. Mr. Fahami would always pay for these dinners.

42. Ms. Kucharski influenced contracts awarded by the NSD because she provides language for the contracts and evaluates proposals that are

submitted. Because of that Ms. Kucharski is able to reject contracts from companies she does not like or promote companies for contracts.

43. Ms. Owens was important because she had input into who would be awarded VA contracts.

44. Mr. Rininger was important because he supplied the language used in the bid contracts.

45. In February 2015, Mr. Fahami gave Mr. Rininger his credit card to pay for a happy hour at Red's Porch in Austin Texas. Many VA officials attended the happy hour including the three mentioned above.

46. On at least one occasion, Mr. Fahami paid for Roger Rininger to travel to Las Vegas for fun. On at least one other occasion, Mr. Fahami traveled with Mr. Rininger to Chile. Based on information and belief, Mr. Fahami paid all of Mr. Rininger's expenses for that trip.

47. It is unlawful for potential contract recipients to pay for and do any of the things mentioned above in paragraphs 35-41.

G. **Shortly after Mr. Robertson told Mr. Fahami that what he was doing was illegal, he was fired.**

48. In September 2015, Mr. Robertson told Mr. Fahami and others at Intratek that he believed the behavior described above was unlawful and that it needed to stop.

49. Within a week, Mr. Robertson was fired because of his report.

H. **After terminating Mr. Robertson, Intratek, Mr. Fahami, and Mr. Rininger all began sabotaging Mr. Robertson's business contracts and potential business contracts.**

50. After Mr. Robertson was terminated, Intratek, Mr. Fahami, and Mr. Rininger began a campaign to intentionally sour Mr. Robertson's relationships with employers, friends, family, and the government.

51. This campaign is still going on today.

52. Among other things, Mr. Fahami went to the Director of the National Service Desk and told him Mr. Robertson was unstable.

53. Mr. Fahami told Nancy Duncan at ASMR, a competitor and potential business partner, the same thing. Mr. Fahami's actions caused an official protest to be lodged against Mr. Robertson, which interfered with Mr. Robertson's business relationship with ASMR.

54. These actions were designed to hinder Mr. Robertson's ability to perform his work and make it much more difficult, expensive, and burdensome for him to complete his tasks.

55. Mr. Rininger has personally gotten involved I the campaign to interfere with Mr. Robertson's business, telling VA officials that ASM Research, it's subcontractors and Mr. Robertson is incompetent.

56. Mr. Rininger's actions caused the ESD to try to cancel ASM Research and Mr. Robertson's subcontract without notice. Mr. Robertson pointed out that under the WARN Act, the contract could not be cancelled without thirty days' notice. Therefore, the ESD then told ASM Research and Mr. Robertson that his contract would not be renewed. These actions made it burdensome and difficult to fulfill the contract requirements as well as

interfered with Mr. Robertson's future business with the ESD on that contract.

57. Mr. Fahami, Intertek and Mr. Rininger have also interfered with MR. Robertson's agreements and potential teaming agreements with Lockheed Martin, Leidos, Systems Made Simple, CSRA, ProSphere, and others by repeatedly defaming Mr. Robertson, his business, and abilities. They are actively preventing Mr. Robertson from being able to make contracts and business deals with these companies.

58. Mr. Fahami has also tried to interfere in Mr. Robertson's current contracts and potential contracts by using his business connections to try to cause Mr. Robertson's Director of Operations to leave Mr. Robertson's company. This would cripple Mr. Robertson's company and his ability to do business in the industry because he would be left with no experienced and knowledgeable staff.

I. **On October 7, 2015, Mr. Robertson reported what he had seen and what had happened to the Office of the Inspector General for Veterans Affairs. An investigation was opened, and the FBI got involved.**

59. On October 7, 2015, Mr. Robertson told the Office of the Inspector General for Veterans Affairs that he had been fired for telling Mr. Fahami and Intratek that their activities were illegal.

60. The OIG opened an investigation into Mr. Robertson's termination and the allegations of bribery and improper conduct.

61. Shortly thereafter, the FBI got involved.

62. The investigation is ongoing.

63. No report or determination has yet been issued by the OIG.

64. All conditions precedent to the filing of this suit have been met.

## IV
## FIRST CAUSE OF ACTION: VIOLATION OF 41 U.S.C. § 4712

65. Plaintiff incorporates paragraphs 1-64 as if restated herein.

66. Defendant Intratek is contractor and subcontractor of the federal government.

67. Plaintiff reported a violation of law, rule, or regulation related to the competition for or negotiation of a federal contract to a management official or other employee of Intratek who has the responsibility to investigate, discover, or address misconduct.

68. Plaintiff was fired for making that report.

## V
## SECOND CAUSE OF ACTION: TORTIOUS INTERFERNECE WITH PROSPECTIVE CONTRACT OR BUSINESS RELATIONS

69. Plaintiff incorporates paragraphs 1-68 as if restated herein.

70. Plaintiff would have entered into a contractual and/or business relationships with Lockheed Martin, Leidos, Systems Made Simple, ProSphere, CSRA, the VA, and others,

71. All Defendants acted with a conscious desire to prevent the business relationships from occurring.

72. All Defendants knew the interference was certain or substantially certain to occur as a result of its conduct.

73. All Defendants' conduct was independently tortious and/or unlawful.

74. All Defendants committed the independent torts of misrepresentation, fraud, and defamation.

75. Defendants' interference proximately caused Plaintiff's injury and he suffered actual damages as a result of Defendant's conduct.

## VI
## THIRD CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH CONTRACT

76. Plaintiff incorporates paragraphs 1-75 as if restated herein.

77. Plaintiff had a valid contract

78. All Defendants willfully and intentionally interfered through hinderance or inducement with the contract

79. The interference caused the contracts to be breached or made performance of the contracts more burdensome, difficult, or expensive.

80. All Defendants' interference caused actual damage or loss to Plaintiff.

## X
## JURY DEMAND

81. Plaintiff demands trial by jury and will tender the appropriate fee.

## XI
## DAMAGES

82. Plaintiff seeks all damages allowed under the law, including monetary relief like back pay, benefits, lost wages, and:

    (a) Plaintiff seeks an injunction prohibiting Defendants from engaging in unlawful practices.

(b)     Plaintiff seeks additional equitable relief as may be appropriate such as reinstatement, promotion, front pay, and court costs.

(c)     Plaintiff seeks compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

(d)     Plaintiff seeks exemplary damages.

(e)     Plaintiff seeks reasonable attorney's fees and costs including reasonable expert fees.

(f)     Plaintiff seeks pre and post judgment interest at the maximum rate allowed by law.

WHEREFORE, premises considered, Plaintiff respectfully prays that Defendant be cited to appear and, that upon a trial on the merits, that all relief requested be awarded to Plaintiff, and for such other and further relief to which Plaintiff is justly entitled.

Respectfully submitted,
WILEY WALSH, P.C.

By: ___/s/ Colin Walsh___
Colin Walsh
Texas Bar No. 24079538
*Board Certified Specialist, Texas Board of Legal Specialization, Labor and Employment Law*
Jairo Castellanos
Texas Bar No. 24089624

WILEY WALSH, P.C.
1011 San Jacinto Blvd., ste 401
Austin, TX 78701
Telephone: (512) 27-5527

PLAINTIFF'S ORIGINAL COMPLAINT Page— 14

Facsimile: (512) 201-1263
colin@wileywalsh.com
ATTORNEYS FOR PLAINTIFF